Daniel William SCOTT, Jr., M.D., Petitioner,

v.

TEXAS STATE BOARD OF MEDICAL EXAMINERS, Respondent.

No. A–10105.

Supreme Court of Texas.

Nov. 11, 1964.

Rehearing Denied Dec. 31, 1964.

Davis & Gray, Houston, for petitioner.

Waggoner Carr, Atty. Gen., Austin, Malcolm Quick and Wm. Morse, Jr., Asst. Attys. Gen., for respondent.

STEAKLEY, Justice.

Acting under Articles 4505 and 4506, Vernon's Ann.Civ.St., the Texas State Board of Medical Examiners revoked and cancelled the license to practice medicine of Petitioner, Daniel William Scott, Jr., M.D. The order of the Board was as follows:

"On this the 18th day of August, 1962, came on to be heard before the Texas State Board of Medical Examiners, duly in session, a certain complaint filed with the Board on the 26th day of July, 1962, in which it was complained that Daniel William Scott, Jr., M.D., had violated the provisions of Sub-Divisions (4), (5), and (12) of Article 4505, Revised Civil Statutes of Texas, 1925, as amended, such violation being grounds for the cancellation, revocation or suspension of the license to practice medicine in the State of Texas, by Daniel William Scott, Jr., M.D., and the said Daniel William Scott, Jr., M.D., of Houston, Harris County, Texas, having appeared in person and through his Counsel, Mr. William Dorman, and the said charges and complaint having been read, and the evidence on said complaint and charges having been introduced and heard, and after consideration of the charges and evidence, *the Board is of the opinion that the charges contained in the complaint are true in so far as said charges relate to prescribing and administering* amphetamine, amphetamine derivatives and compounds, barbiturates, barbiturate derivatives and compounds, *and Class A narcotic drugs to known addicts, and also* in so far as said complaint relates to *prescribing and administering* amphetamine, amphetamine derivatives, and compounds, barbiturates, barbiturate derivatives and compounds, *and Class A narcotic drugs to patients of Daniel William Scott, Jr., M.D., under conditions which said Daniel William Scott, Jr., M.D., knew or should have known there was no therapeutic need for such patients,* therefore

"IT IS ACCORDINGLY ORDERED, ADJUDGED AND DECREED, that the license to practice medicine within the State of Texas, heretofore held by Daniel William Scott, Jr., M.D., be revoked and cancelled.

"Rendered and entered this 18th day of August, 1962." (Emphasis added)

The Board recognizes that the findings in the above order do not support a revocation under Subdivisions (5) and (12) of Article 4505. Its position is that the findings that Scott prescribed and administered narcotic drugs to known addicts and, additionally, that Scott prescribed and administered narcotic drugs to his patients when there was no medical need therefor, support the act of revocation of Scott's license under Sub-division (4) of Article 4505 which defines a cause for revocation as "(4) Grossly unprofessional or dishonorable conduct, or [sic—should read *of*] a character which in the opinion of the Board is likely to deceive or defraud the public."

Scott appealed the order of cancellation to the district court. The court ruled that the case should be tried pursuant to the appeal provisions of Article 4506 which require that the proceeding on appeal shall be in the nature of a trial *de novo* as such term is commonly used and intended in an appeal from the justice court to the county court. Under the ruling of the trial court the burden of sustaining its order was placed on the Board. Trial was to a jury. The Board offered evidence to establish that between July 1, 1960, and March 3, 1963, approximately one hundred and five prescriptions for various drugs identified as amphetamine, amphetamine derivatives, amphetamine compounds, barbiturates, barbiturate derivatives, barbiturate compounds, or Class A narcotic drugs were issued by Scott to one Douglas Aitken; that between August 28, 1961, and March 22, 1962, nine similar prescriptions were issued to one Eugene Ansley; and that between November 30, 1961, and August 10, 1962, twenty-eight similar prescriptions were issued to one Paul Ross.

Evidence was also offered to establish that each of these individuals was a known drug addict; and, further, that drug prescriptions on a lesser number of occasions were issued by Scott to other addicts. There was evidence that the recipients of the prescriptions were of disreputable, and in some instances of criminal, character. No evidence was offered by the Board to establish, either by the testimony of its members or other members of the medical profession, that recipients of the prescriptions could not have had a medical need therefor and that the prescriptions did not constitute proper medical treatment.

The jury was instructed "that a duly licensed medical doctor holding a valid federal narcotic license is legally and medically authorized to prescribe narcotic drugs to his patients, whether or not such patients are known to be addicted to the use of such drugs, if, in the opinion of such medical doctor the giving of such drugs is of therapeutic value in the treatment of such patients." This instruction comports with the provisions of the Penal Code.[1]

The jury found that Scott prescribed the drugs to persons known to him to be addicted to one or more of them; that Scott in the exercise of ordinary care should have known that the persons for whom he prescribed the drugs were addicted to one or more of them; and that the conduct represented by these respective findings constituted grossly unprofessional and dishonorable conduct of a character likely to deceive or defraud the public.

The trial court, however, granted Scott's motion for judgment non obstante veredicto and entered judgment denying the Board the right to cancel his license. The Court of Civil Appeals reversed and remanded the

cause for a new trial.[2] It held unconstitutional the appeal provision of Article 4506 as violative of Article II, Section 1, of the Constitution of Texas, Vernon's Ann.St. providing for the division of powers into three departments of Executive, Legislative and Judicial. The remand for a new trial under the substantial evidence rule was stated by the Court of Civil Appeals to be in the interest of justice because the case had not been fully developed. Both Scott and the Board of Medical Examiners have filed Applications for Writ of Error. Each urges for different reasons that the remand of the case by the Court of Civil Appeals was in error, and each seeks a favorable judgment of rendition. We reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court.

It is the basic position of Scott that the requirement of Article 4506 for a full *de novo* trial is constitutional; that the Board failed to discharge its burden of establishing its case against him by competent evidence before the court, particularly in not offering medical and expert evidence to establish that the prescriptions issued by him were not issued in good faith and in response to medical needs; that the findings of the jury will not support a revocation under Subdivision (4) of Article 4505; that the delegation to the Board in Subdivision (4) provides no standard, and is so vague, indefinite and uncertain as to render the Subdivision void for want of due process.

The basic position of the Board is that the Court of Civil Appeals correctly held the appeal provision of Article 4506 unconstitutional and that the case should have been tried under the substantial evidence rule; but that the Court of Civil Appeals erred in failing to hold as a matter of law

1. "A physician or a dentist, in good faith and in the course of his professional practice only, may prescribe, administer, and dispense narcotic drugs * * *." "It shall be unlawful for any person to habitually use narcotic drugs, be addicted to the use of narcotic drugs, or be under the influence of narcotic drugs, provided, however, that nothing in this Section shall be applicable to a person who has a medical need for narcotic drugs * * *." Article 725b, Section 7(1) and Article 725c, Section 2, Vernon's Annotated Penal Code.

2. Texas State Board of Medical Examiners v. Scott, Tex.Civ.App., 377 S.W.2d 104.

that its order revoking Scott's license has reasonable support in substantial evidence.

In the enactment of statutes governing the qualifications to practice medicine in Texas, the Legislature is exercising an expressly granted constitutional authority. Article XVI, Section 31, of the Constitution of Texas provides:

"The Legislature may pass laws prescribing the qualifications of practitioners of medicine in this State, and to punish persons for mal-practice, but no preference shall ever be given by law to any school of medicine."

The present statutes stem from an Act of the 29th Legislature in 1905 prohibiting malpractice and frauds in the practice of medicine and providing for revocation by the District Court of the license to practice medicine; [3] and from the Medical Practice Act of 1907.[4]

Section 11 of the 1907 Act, which became Article 4505 of the 1925 codification, provided that the State Board of Medical Examiners may refuse to admit persons to its examinations or to issue a medical license for various causes, one of which was "other grossly unprofessional or dishonorable conduct of a character likely to deceive or defraud the public." [5]

In 1939 major revisions in the Medical Practice Act were enacted.[6] As relevant here, present Subdivision (4) was made a part of Article 4505 and similar language was removed from Article 4507. For the first time there was included the phrase "which in the opinion of the Board," so that the subdivision reads "[g]rossly unprofessional or dishonorable conduct [of], a character which in the opinion of the Board is likely to deceive or defraud the public."

It is to be further noted that the right of revocation of a medical license (as distinguished from a refusal to issue a license initially) was by the 1939 amendments limited to the district courts. But in 1953 [7] the Legislature repealed Article 4507 and Article 4506 was amended to invest the Texas State Board of Medical Examiners with authority to cancel, revoke or suspend the license of a practitioner of medicine. The amendment of Article 4506 authorized such action "upon proof of the violation of the law in any respect with regard thereto, or for any cause for which the Board shall be authorized to refuse to admit persons to its examination, as provided in Article 4505 of the Revised Civil Statutes of Texas, 1925, as amended." One of such causes is set forth in Subdivision (4) of Article 4505. It was further expressly provided in the 1953 amendment of Article 4506 that:

"Any person whose license to practice medicine has been cancelled, re-

---

3. Acts 1905, Ch. 150, p. 370; present Art. 4512, R.C.S., reading as follows:
"Any physician or person who is engaged in the practice of medicine, surgery, osteopathy, or who belongs to any other school of medicine, whether they use the medicines in their practice or not, who shall be guilty of any fraudulent or dishonorable conduct, or of any malpractice, or shall, by any untrue or fraudulent statement or representations made as such physician or person to a patient or other person being treated by such physician or person, procure and withhold, or cause to be withheld, from another any money, negotiable note, or thing of value, may be suspended in his right to practice medicine or his license may be revoked by the district court of the county in which such physician or person

resides, or of the county where such conduct or malpractice or false representations occurred, in the manner and form provided for revoking or suspending license of attorneys at law in this State."

4. Acts 1907, Ch. CXXIII, p. 224.

5. Sustained against the attack that the language is vague, uncertain and indefinite. Morse v. State Board of Medical Examiners, 57 Tex.Civ.App. 93, 122 S.W. 446 (1909, wr. ref.); Berry v. State, 135 S.W. 631 (C.C.A.1911, wr. ref.): cf. Texas State Board of Medical Examiners v. Koepsel, 159 Tex. 479, 322 S.W.2d 609 (1959).

6. Acts 1939, Ch. 3, p. 352.

7. Acts 1953, Ch. 426, p. 1029.

voked or suspended by the Board may, within twenty (20) days after the making and entering of such order, take an appeal to any of the district courts in the county of his residence, but the decision of the Board shall not be enjoined or stayed except on application to such district court after notice to the Board. The proceeding on appeal shall be a trial de novo, as such term is commonly used and intended in an appeal from the justice court to the county court, and which appeal shall be taken in any District Court of the county in which the person whose certificate of registration or license is involved, resides. * * * "

█ In the type of appeal thus required the court tries the issues anew. The burden of proof in sustaining the order is upon the administrative agency. Whether by the court or a jury, fact questions are resolved by a preponderance of the evidence. Southern Canal Co. v. State Board of Water Engineers, 159 Tex. 227, 318 S.W.2d 619 (1958); State by and through State Board of Morticians v. Cortez, 160 Tex. 532, 333 S.W.2d 839 (1960); Key Western Life Insurance Co. v. State Board of Insurance, 163 Tex. 11, 350 S.W.2d 839 (1961).

In the reported cases since the 1953 amendments, the State Board of Medical Examiners does not appear to have attacked the constitutionality of the appeal provisions of Article 4506. Texas State Board of Medical Examiners v. Koepsel, 159 Tex. 479, 322 S.W.2d 609 (1959), was an appeal from the act of the Board in cancelling the license of Dr. Koepsel to practice medicine; this Court spoke of fact questions to be submitted to the jury. It was stated in Rockett v. Texas State Board of Medical Examiners, 287 S.W.2d 190 (C.C.A.1956, writ ref. n. r. e.), that "There can be no question but that appellant was entitled to a trial 'de novo' in its broadest sense." Cf. Watt v. Texas State Board of Medical Examiners, 303 S.W.2d 884 (C.C.A. 1957, writ ref.); Jacobi v. Texas State Board of Medical Examiners, 308 S.W.2d 261 (C.C.A.1957, writ ref. n. r. e.); Texas State Board of Medical Examiners v. McClellan, 307 S.W.2d 317 (C.C.A.1957, writ ref. n. r. e.).

It is seen from the legislative history of the Medical Practice Act that from the beginning the revocation of a medical license has been committed to the district courts as a judicial function. It has been traditionally so. It is still an original function of the district courts under present Article 4512 if a practitioner has been guilty of "any fraudulent and dishonorable conduct," as well as for other causes specified in the statute. Revocation of a medical license was also an original function of the courts under Article 4507 until the 1953 amendments; since the amendments revocation has been an appeal function of the courts. See Goldman v. State, 277 S.W. 2d 217 (C.C.A.1954, wr. ref., n. r. e.). There is a difference, legislatively recognized through the years, between an exercise of the power to examine and issue a medical license, and an exercise of the power to revoke a medical license for cause. The Legislature has not required that an appeal from acts of the Board refusing to examine an applicant and to issue a medical license shall be de novo in the full sense; it has done so with respect to the appeal from an act of the Board revoking a medical license once granted. It is self-evident that the latter does not involve a question of public policy and the determination of legislative facts in the sense of the decisions of this Court in Davis v. City of Lubbock, 160 Tex. 38, 326 S.W.2d 699, and Chemical Bank and Trust Co. v. Falkner, 369 S.W.2d 427 (Tex.Sup.1963). This points to what should be the controlling criteria of constitutionality. The validity of a full de novo appeal requirement turns on the nature of the act of the administrative agency contemplated by the statute to which the appeal requirement refers. An important consideration is whether the administrative action called for by the empowering legislative act involves public pol-

icy or is policy-making in effect, or whether the action concerns only the parties who are immediately affected. Here, the question of whether a particular medical practitioner has performed acts and engaged in conduct requiring revocation of his license under the standards prescribed by the Legislature involves the professional activities of only one person. In resolving this matter the Board was not engaged in promulgating rules of general application or in deciding questions of broad public policy. The fact questions inherent in the decision of the Board are typical of those which can on appeal be decided by a judge or a jury on evidence introduced in court.

We recognize that there are differences in the wording of the subdivisions of Article 4505. Subdivisions (3) and (4), for example, employ the phrase "in the opinion of the Board" which is absent from the other eleven subdivisions. It is argued that this phrase necessarily represents a delegation of legislative discretion which cannot be constitutionally exercised by the courts on appeal. But a revocation by the Board under each of the subdivisions of Article 4505 necessarily is addressed to the opinion of the Board; that is, the Board must be of the opinion that the licensee has been guilty of acts and conduct contrary to the legislative standards embraced within the particular subdivision under which the Board acts. The constitutionality of the *de novo* appeal requirement should not be made to turn on technical differences in the terminology or upon the "quantity" of delegation which may be said to be encompassed in the language used. It would be artificial indeed to say that the *de novo* appeal requirement is unconstitutional as to those subdivisions of Article 4505 which employ the phrase "in the opinion of the Board" but is constitutional as to the other subdivisions which do not do so.

■ Accordingly, we sustain the constitutionality of the *de novo* appeal requirement of Article 4506 as not being in contravention of the separation of powers provision of the Texas Constitution, Article II, Section 1. The trial court therefore correctly ruled that the appeal from the order of revocation of the Board in the case at bar was to be tried *de novo* in the full sense, with the burden upon the Board to establish its case for revocation of Scott's license by competent evidence before the court.

■ The Board itself found Scott guilty of two types of acts. These were the prescribing of narcotic drugs for known addicts, and the prescribing of narcotic drugs for patients having no medical need therefor. Only the former was submitted to the jury which found that Scott did prescribe narcotic drugs to persons whom he knew, or should have known, were addicts. There is evidence to support these jury findings. But the question is whether the acts represented by these findings, standing alone, and in the absence of evidence that the persons receiving the drugs had no medical need therfor, constitute acts and conduct which are grossly unprofessional or dishonorable and of a character likely to deceive or defraud the public. We hold that they are not. The Penal Code expressly authorizes the good faith prescription of narcotic drugs by a licensed physician and the prohibitions of the Code with respect to the use of narcotic drugs do not apply to a person having a medical need therefor. We recognize that the prescriptions which were shown to have been issued by Scott appear excessive to our lay minds; but there was no evidence offered by the Board from experts in the field of medicine, and in the use of narcotic drugs, to establish that Scott was not acting in good medical faith or that the prescriptions were not issued in response to medical needs. We would have no difficulty in holding that the acts and conduct of a medical practitioner in prescribing narcotic drugs in medical bad faith would support the revocation of his license under Subdivision (4) of Article 4505. But such is not shown in the record before us and the trial court properly entered judgment denying the Board the right to cancel Scott's license.

In its original application for writ of error the Board asserted by point of error that the Court of Civil Appeals erred in remanding this case for a new trial. Its argument thereunder was that its order has reasonable support in substantial evidence. In its post-submission brief the Board argues further that the evidence supported the jury findings and that a judgment based thereon, and affirming the action of the Board, should have been entered by the trial court "in the interest of the public." It is argued that the case for the Board is established by proof that Scott prescribed narcotics on the numerous occasions shown to persons already addicted, and by the failure of Scott to testify in justification of his conduct. Section 21 of Article 725b of the Penal Code is cited as support for the propositions that the Board did not have the burden of establishing the absence of a medical need for the prescriptions issued by Scott, and that the jury was entitled to consider Scott's failure to justify the prescriptions. Section 21 of Article 725b provides that the burden shall be upon the defendant to establish any exception, excuse, proviso, or exemption *in a proceeding brought for the enforcement of any provisions of Article 725b.* But Article 725b is a penal statute and has no relation to the instant proceeding; moreover, this statute does not define as a criminal offense the prescription of narcotic drugs for an addict. And, as before noted, Section 7 of Article 725b expressly authorizes the prescription of narcotic drugs by a physician in good faith and in the course of his professional practice. Article 725c of the Penal Code, which defines the crimes of habitual use of narcotic drugs, addictions to the use of narcotic drugs,[8] and being under the influence of narcotic drugs, further provides that such provisions shall not be applicable to a person who has a medical need for narcotic drugs.

We also mention that neither the Dental Statute, Article 4549, nor the Pharmacy Statute, Article 4542a, Section 12; nor the Optometry Statute, Article 4563, require that the proceeding on appeal from the acts of these respective Boards revoking and cancelling licenses shall be by trial *de novo* as in the appeal from the justice court to the county court. The cited cases holding that appeals therefrom are governed by the substantial evidence rule are therefore not in point to the Medical Practice Act, e. g., Texas State Board of Dental Examiners v. Fenlaw, 357 S.W.2d 185 (C. C.A.1962, no writ hist.) ; Garner v. Texas State Board of Pharmacy, 304 S.W.2d 530 (C.C.A.1957, writ ref.) ; State Board of Examiners in Optometry v. Marlow, 257 S.W.2d 761 (C.C.A.1953, no writ hist.). This is likewise true of decisions in other jurisdictions with different statutory provisions; e. g., State Board of Medical Reg. and Exam. v. Scherer, 221 Ind. 92, 46 N.E. 2d 602 (1943) ; In re Harmon, 52 Wash. 2d 118, 323 P.2d 653 (1958) ; Jaffe v. State Department of Health, 135 Conn. 339, 64 A.2d 330, 6 A.L.R.2d 664 (1949).

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.

GRIFFIN, J., dissenting.

SMITH, Justice (concurring).

I concur in the holding that the revocation of a medical license has been committed by the Legislature to the district courts as a judicial function. The revocation of a doctor's license by a state agency is primarily a quasi-judicial function. While the Court in the present case has held that the trial court correctly ruled that the appeal from the order of revocation of the Board was to be tried *de novo,* and that the burden of proof was upon the Board, etc., yet, the Court, by way of dicta, seems to advance a new theory and a new test which would further complicate an already complex problem. Of course, it is true, as Mr. Justice Holmes once pointed out, the business of

---

8. Held invalid as to drug addiction in Ex Parte Rogers, 366 S.W.2d 559.

courts is to draw difficult lines, but, this does not mean that it is the business of the courts to, by way of dicta, create perplexing problems.

The Court's holding that "[t]he validity of a full *de novo* appeal requirement turns on the nature of the act of the administrative agency contemplated by the statute to which the appeal requirement refers," coupled with the dictum—"We would have no difficulty in holding that the acts and conduct of a medical practitioner in prescribing narcotic drugs in medical bad faith would support the revocation of his license under Subdivision (4) of Article 4505," indicates to me that if testimony by experts in the field of medicine had been introduced, establishing that Scott had acted in medical bad faith, the Court would hold that the Legislature did not intend to provide for a trial *de novo* upon a conviction under subdivision (4) of Article 4505. Be that as it may, this philosophy is definitely an unnecessary and unwarranted extension of the line drawn by this court in the case of Key Western Life Insurance Co. v. State Board of Insurance, 163 Tex. 11, 350 S.W.2d 839. Although the Court cites Key Western on one narrow holding, yet, in my opinion, the Court, in the main, is, in principle, following the basic holding made in Key Western. Apparently the Court is disturbed because of the magnitude of the alleged violations of the law by the doctor. Admittedly, the charges, if true, are serious, indeed, but what would the Court say if we had before us a factual background showing only that the Board was seeking to revoke the doctor's license because of a single violation? This Court should bear in mind that its business is to construe statutes, when required to do so in a given case, and not to act as the trier of facts. I am opposed to any suggestion that is in the least contradictory of a holding that the Legislature meant to provide for a trial *de novo* in cases involving charges of a violation of Article 4505, including subdivision (4). Perhaps it could be said that the Legislature acted unwisely in this respect, but that is not the question before

us. This Court said in State Board of Insurance v. Betts, (1958), 158 Tex. 612, 315 S.W.2d 279, 281:

"It is concededly a serious matter to strike down duly enacted legislation as being unconstitutional. It is perhaps an equally serious matter to hold that the Legislature did not mean what it said. The problem of statutory construction is to ascertain the intent of the Legislature. When we abandon the plain meaning of words, statutory construction rests upon insecure and obscure foundations at best. It should perhaps be reiterated that Courts have no concern with the wisdom of legislative acts, but it is our plain duty to give effect to the stated purpose or plan of the Legislature, although to us it may seem ill advised or impracticable."

This Court, in Key Western, quoted with approval the above pronouncement. It is my view that if the Court will give effect to the stated purpose of the Legislature, it will eliminate all suggestions that there possibly could be a way to circumvent the stated purpose, and will give to all doctors charged with a violation or violations the same fair and impartial trial under proper *de novo* proceedings.

To me, there is a close analogy between Key Western and this case. We have the question: Is the Board exercising legislative power in revoking a license, or is it performing a semi-judicial function? This question was sufficiently answered in Key Western when it was said:

"Therefore, the Board * * * could exercise no more discretion than the terms of the statute clearly provide, and it appears from a literal reading of the statute that the Board was not to have broad legislative discretion. The Board of Insurance Commissioners is empowered to disapprove a form for certain specific reasons only and may not dictate to the insurance companies the particular form to be used. *Its only duty is to determine whether the form of the*

*policy submitted for its approval meets the standards prescribed by the statute.* The action of the Board of Insurance Commissioners 'is particular and immediate, rather than, as in the case of legislative or rule-making action, general and future in effect.' " (Emphasis added.)

Clearly the Board's action is "particular and immediate, rather than * * * general and future in effect." The primary duty of the Texas State Board of Medical Examiners, under Articles 4505 and 4506, is to determine whether the conduct of the accused doctor is such that is enjoined by the statute. The degree of the alleged violation has nothing to do with this determination, likewise, it should have no bearing upon our problem of ascertaining the intent of the Legislature. As a matter of fact, we have a much less complex problem here than confronted us in Key Western. The charges against the doctor are akin to being criminal in nature. Certainly, the proposed action of the Board will peculiarly and directly affect the doctor. It is fundamental to our American system that a man "have his day in court." Where the government, acting directly or through a Board or administrative agency, singles out an individual or small group and proposes action which substantially alter the individual's rights then he is justly entitled to his day in court. The Legislature by enacting Articles 4505 and 4506 surely intended the proceedings to be in all respects a judicial action.

In Key Western, this Court cited with approval the holding of the United States Supreme Court wherein it was said:

"'A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power.' Prentis v. Atlantic Coast Line, 211 U.S. 210, 29 S.Ct. 67, 69, 53 L.Ed. 150."

In Key Western, in holding that the determination made by the Board was not the exercise of legislative discretion, this Court rejected the contention that the case of Davis v. City of Lubbock, (1959) 160 Tex. 38, 326 S.W.2d 699, was controlling. Key Western was a direct appeal. In connection with our analysis of the Davis case, we said:

"Appellee fails to appreciate that there is a distinction between the types of decisions rendered by different administrative agencies. Some agencies perform judicial or quasi-judicial functions; others exercise powers which are essentially legislative. In re Harmon, 1958, 52 Wash.2d 118, 323 P.2d 653."

This Court pointed out that in Davis we said:

"'* * * it is quite clear that a decision that it [a particular area] is a slum area under (3) of the definition is a decision of a question of pure public policy.'

"'A decision or conclusion by the agency that a particular area is a "Slum Area" or a "Blighted Area" is thus made to rest upon a finding involving *legislative discretion.* A de novo judicial review of *such* a decision would clearly involve the exercise by the courts of nonjudicial powers.' (Emphasis added.) 326 S.W.2d 699, 714."

It is to be noted that the concurring opinion in Key Western states that under Article 21.21 of the Insurance Code, the Board is "given the power to call before it any person who is accused of deceptive acts or practices or unfair methods of competition in the business of insurance. It has authority to issue cease and desist orders to stop the objectionable practices. To me, this would have been the proper approach to the objectionable practices in this case." This theory was rejected in

Key Western, yet, the Court seems to be adopting such view by projecting the line drawn in Key Western, as heretofore indicated.

In June, 1963, this Court rendered its opinion in the case of Chemical Bank & Trust Company v. Falkner, Tex., 369 S.W. 2d 427. Contrary to the argument of some, the judgment in Chemical did not modify or overrule our opinion and judgment in Key Western rendered in October, 1961. This Court in Chemical clearly distinguished Key Western in disposing of the argument that Chemical was controlled by Key Western. The Court said:

> "It is contended that the Key Western case laid down a broad rule for determining whether a function of an administrative agency is judicial or legislative. The court said that judicial action is 'particular and immediate, rather than, as in the case of legislative or rule making action, general and future in effect.' * * * The heart of the decision in the Key Western case was that the statute did not give the Insurance Board legislative discretion in approving insurance policies."

The dissenting opinion in Chemical, however, seems to have selected our approval in Key Western of a holding in a Minnesota case, State ex rel. Patterson v. Bates, 96 Minn. 110, 104 N.W. 709, as being the heart of the Key Western case. In Chemical, this Court did not accept the dissenting view that the question of whether there is a public need for a bank in a given area is a pure fact question—one which a trial judge or jury could decide on evidence available for introduction in court.

In Chemical as in Key Western this Court recognized that there is a distinction between the types of decisions rendered by different administrative agencies. In view of the analysis of Key Western in Chemical, I cannot conceive of a logical reason for rejecting a holding in this case that the doctor is entitled to an adjudication of his rights under *de novo* proceedings.

The holding in Key Western is neither new nor novel. Since the writing of Key Western, this Court has caused further research to be made in an effort to find additional guide lines for determining the perplexing question: Was the agency action primarily rule making or adjudicative?

In the case of Londoner v. Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908) and in the case of Bi-Metallic Investment Co. v. State Board of Equalization of Colorado, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915), the question was whether the plaintiff was entitled to a full due process hearing before proposed agency action became final. In the present case the question is whether the Legislature may provide *de novo* review of this type of agency action. In the Londoner case, the Court found that the agency's action was quasi-judicial, and held that there had been a denial of due process. In reaching a different result in the Bi-Metallic case, Mr. Justice Holmes, speaking for the Court, distinguished the Londoner case with these words:

> "In Londoner v. Denver * * * a local board had to determine 'whether, in what amount, and *upon whom*' a tax for paving a street should be levied for special benefits. A relatively small number of persons was concerned, who were exceptionally affected, in each case upon individual grounds, and it was held that they had a right to a hearing. But that decision is far from reaching a general determination dealing only with the principle upon which all the assessments in a county had been laid." (Emphasis added.)

Taking the cases together, the rule seems to be that the first inquiry is whether the action is "forward looking" or whether it refers to past acts or a present situation. If the latter, then the action is adjudication. To me, the holding in Key Western is, in effect, the same as Londoner.

It is my position that if, as in Londoner, a *small group* were exceptionally affected,

in each case upon individual grounds, most certainly the doctor in this case is exceptionally and individually affected.

In Key Western, this Court quoted from 4 Davis. Perhaps the Key Western holding could have been materially strengthened if this Court had quoted the following from Professor Davis' 1 Administrative Law Treatise 413 (1958):

"* * * Adjudicative facts are the facts about the parties and their activities, business and properties. Adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion.

"Facts pertaining to the parties and their business and activities, that is, adjudicative facts, are intrinsically the kind of facts that ordinarily ought not to be determined without giving the parties a chance to know and to meet any evidence that may be unfavorable to them, that is, without providing the parties an opportunity for trial. The reason is that the parties know more about the facts concerning themselves and their activities than anyone else is likely to know, and the parties are therefore in an especially good position to rebut or explain evidence that bears upon adjudicative facts. Yet people who are not necessarily parties, frequently the agencies and their staffs, may often be the masters of legislative facts. Because the parties may often have little or nothing to contribute to the development of legislative facts, the method of trial often is not required for the determination of disputed issues about legislative facts."

It should be noted that Professor Davis seems to stress the distinction between "adjudicative facts" and "legislative facts." This theory, however, does not run contrary to or conflict with the basic holding in Key Western. In fact, this treatise would have been a material adjunct to the rules and definitions set out in Key Western which were used in determining that the policy form contains provisions which "encourage misrepresentation or are unjust, unfair, inequitable," was a judicial function.

For the reasons stated, I join in the judgment reversing that of the Court of Civil Appeals and affirming the judgment of the District Court.